## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JUSTIN A. TUTTELMAN, Derivatively on Behalf of PLATFORM SPECIALTY DATA SECURITY INTERNATIONAL, INC., | Case No.: |
| Plaintiff, | |
| v. | |
| MARTIN E. FRANKLIN, DANIEL H. LEEVER, WAYNE M. HEWETT, IAN G.H. ASHKEN, NICOLAS BERGGRUEN, MICHAEL F. GOSS, RYAN ISRAEL, and E. STANLEY O'NEAL, | |
| Defendants, | |
| and, | |
| PLATFORM SPECIALTY PRODUCTS CORPORATION, | |
| Nominal Defendant. | |

Plaintiff Justin A. Tuttelman ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Platform Specialty Products Corporation ("Platform" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Platform with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action brought in the right, and for the benefit, of

Platform against certain of its officers and directors seeking to remedy Defendants' (as defined below) breach of fiduciary duties and gross mismanagement that occurred from February 17, 2015 through the present (the "Relevant Period") and have caused substantial harm to Platform.

2.     Platform produces and sells specialty chemical products in the Americas, the Asia Pacific region, and Europe.  Platform operates through two segments: (1) Performance Solutions and (2) Agricultural Solutions.

3.     Platform was founded in 1922.  Formerly known as Platform Acquisition Holdings Limited, the Company changed its name to Platform Specialty Products Corporation in October 2013.  Platform is headquartered in West Palm Beach, Florida.  The Company's stock trades on the NYSE under the ticker symbol "PAH."

4.     On February 17, 2015, Platform completed the acquisition of Arysta LifeScience Limited ("Arysta"), a crop protection and life science company with operations in more than 125 countries worldwide.

5.     Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Arysta had made improper third-party payments in West Africa; (ii) that the foregoing payments were unlawful under the U.S. Foreign Corrupt Practices Act ("FCPA"); and (iii) as a result of the foregoing, Platform's public statements were materially false and misleading at all relevant times.

6.     This action arises from Defendants' authorizations for Platform to conduct its business and operations in foreign countries, some of which are generally perceived as having less developed legal and regulatory frameworks, and/or cultures in which requests for improper payments are not discouraged, without installing and maintaining the internal controls and accounting systems

necessary for Platform's compliance with the requirements of the FCPA, including its books and records provisions.

7.      The FCPA makes it unlawful for covered companies such as Platform to make improper payments to foreign officials to obtain or retain business.  To prevent such bribes and kickbacks from occurring, the FCPA requires that covered companies establish and maintain a system of accounting controls to ferret out and ultimately prevent such illicit payments.

8.      Because Platform operates in some countries which involve a higher than normal risk of violations of the anti-corruption laws, including the FCPA, the Platform Board had a fiduciary duty to install and maintain internal controls and accounting system for compliance with the FCPA.

9.      The FCPA controls bribery by (1) prohibiting any U.S. citizen (individual or corporate) from bribing a foreign official, 15 U.S.C. § 78dd-1; and (2) establishing record-keeping rules for issuers of securities of publicly held corporations registered under the Exchange Act, 15 U.S.C. § 78m(b)(2).  The latter (2) is composed of two categories: (1) the issuers are required to "make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the issuer "§ 78m(b)(2)(A) and (2) the issuers must "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances of compliance," § 78m(b)(2)(B).  "Records" under § 78m(b)(2)(A) include "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language." 25 U.S.C. § 78c(a)(37).

10.     More specifically, the anti-bribery provisions of the FCPA, 15 U.S.C. § 78dd-1(a),17 prohibit issuers of registered securities from attempting to influence foreign officials by offering, promising, or giving "anything of value" to a foreign official to secure "any improper advantage" "in order to assist that issuer in obtaining or retaining business for or with, or directing business to, any

person," *i.e.*, in other words bribe a foreign official to obtain or retain business. 15 U.S.C. §§ 78dd-1(a) and 78dd-2(a). A "foreign official" is broadly defined as any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency or instrumentality, or for or on behalf of any such public international agency. § 78dd-1(f)(1)(A).

11.     The details about the investigation into Platform's business practices and possible violation of the FCPA have been closely guarded and not fully disclosed to Platform's shareholders. Consequently, Platform shareholders have been kept in the dark about the precise nature and scope of the Company's possible liability for violations of the FCPA.

12.     On March 11, 2016, Platform disclosed in its 2015 annual report that it had "discovered certain payments made to third-party agents in connection with Arysta's government tender business in West Africa which may be illegal or otherwise inappropriate" and had "engaged outside counsel and an outside accounting firm to conduct an internal investigation to review the legality of these and other payments . . . including Arysta's compliance with the FCPA."

13.     On this news, Platform stock fell $0.28 per share, or 3.16%, to close at $8.57 on March 14, 2016, the following trading day.

14.     On March 14, 2016, shortly before the end of the trading day, the *Wall Street Journal* published a story addressing the disclosures by Platform described above entitled "Chemical Company Notifies U.S. of West Africa FCPA Probe."

15.     On this news, Platform stock fell $0.62 per share, or 7.23%, to close at $7.95 on March 15, 2016.

## THE PARTIES

### Plaintiff

16.     ***Plaintiff*** is, and was at relevant times, a shareholder of Platform.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Plaintiff is a resident of the State of Florida.

### Nominal Defendant

17.     ***Nominal Defendant Platform*** is incorporated in Delaware, and the Company's principal executive offices are located at 1450 Centrepark Boulevard, Suite 210, West Palm Beach, Florida 33401.

### Director Defendants

18.     ***Defendant Martin E. Franklin*** ("Franklin") has served as a director of Platform since April 28, 2013, and has served as Chairman since October 31, 2013.  Franklin owns 6.4% of all the outstanding shares of Platform.  Franklin breached his fiduciary duties by failing to require Platform to implement internal controls in compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Platform.  Franklin also breached his fiduciary duties owed to Platform by failing to direct Platform to initiate suit against the Company's current Board members and officers for causing and/or allowing Platform to engage in activities that are in violation of the FCPA.

19.     ***Defendant Daniel H. Leever*** ("Leever") served as Platform's Chief Executive Officer ("CEO") from October 2013 until December 2015.  Leever has also served as a director of Platform since October 31, 2013.  Leever owns 3.6% of all the outstanding shares of Platform.  Leever breached his fiduciary duties by failing to require Platform to implement internal controls in

compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Platform.  Leever also breached his fiduciary duties owed to Platform by failing to direct Platform to initiate suit against the Company's current Board members and officers for causing and/or allowing Platform to engage in activities that are in violation of the FCPA.

20.      **Defendant Wayne M. Hewett** ("Hewett") joined Platform as President in February 2015, and has served as a director of Platform since shortly after the acquisition of Arysta by Platform in February 2015.  Prior to joining Platform, Hewett had served as President and Chief Executive Officer of Arysta since January 2010.  Hewett joined Arysta in October 2009 as Chief Operating Officer.  Hewett breached his fiduciary duties by failing to require Platform to implement internal controls in compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Platform.  Hewett also breached his fiduciary duties owed to Platform by failing to direct Platform to initiate suit against the Company's current Board members and officers for causing and/or allowing Platform to engage in activities that are in violation of the FCPA.

21.      **Defendant Ian G.H. Ashken** ("Asken") has served as a director of Platform since October 31, 2013.  Ashken breached his fiduciary duties by failing to require Platform to implement internal controls in compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Platform.  Ashken also breached his fiduciary duties owed to Platform by failing to direct Platform to initiate suit against the Company's current Board

members and officers for causing and/or allowing Platform to engage in activities that are in violation of the FCPA.

22. **Defendant Nicolas Berggruen** ("Berggruen") has served as a director of Platform since April 28, 2013. Berggruen founded what became Berggruen Holdings Ltd. in 1984 to act as the direct investment vehicle of what became the Nicolas Berggruen Charitable Trust. Berggruen has served as the Chairman of Berggruen Holdings Ltd. since its inception. Berggruen Holdings Ltd. owns 5.6% of all Platform outstanding shares. Berggruen is a member of the Compensation Committee. Berggruen breached his fiduciary duties by failing to require Platform to implement internal controls in compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Platform. Berggruen also breached his fiduciary duties owed to Platform by failing to direct Platform to initiate suit against the Company's current Board members and officers for causing and/or allowing Platform to engage in activities that are in violation of the FCPA.

23. **Defendant Michael F. Gross** ("Gross") has served as a director of Platform since October 31, 2013. Gross breached his fiduciary duties by failing to require Platform to implement internal controls in compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Platform. Gross also breached his fiduciary duties owed to Platform by failing to direct Platform to initiate suit against the Company's current Board members and officers for causing and/or allowing Platform to engage in activities that are in violation of the FCPA.

24. **Defendant Ryan Israel** ("Israel") has served as a director of Platform since October

31, 2013.  Israel is currently a partner at Pershing Square Capital Management, L.P. ("Pershing Square"), a research intensive, fundamental value based investment firm based in New York City. Israel joined Pershing Square in March 2009.  Pershing Square Capital Mgmt., L.P. owns 22.2% of all Platform outstanding shares.  Israel is a member of the Compensation Committee.  Israel breached his fiduciary duties by failing to require Platform to implement internal controls in compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Platform.  Israel also breached his fiduciary duties owed to Platform by failing to direct Platform to initiate suit against the Company's current Board members and officers for causing and/or allowing Platform to engage in activities that are in violation of the FCPA.

25.     **Defendant E. Stanley O'Neal** ("O'Neal") has served as a director of Platform since October 31, 2013.  O'Neal is the Chairman of the Compensation Committee.  O'Neal breached his fiduciary duties by failing to require Platform to implement internal controls in compliance with the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, which are designed to ferret out and ultimately prevent just the type of bribery and kickbacks that have occurred at Platform.  O'Neal also breached his fiduciary duties owed to Platform by failing to direct Platform to initiate suit against the Company's current Board members and officers for causing and/or allowing Platform to engage in activities that are in violation of the FCPA.

26.     Defendants Franklin, Leever, Hewett, Ashken, Berggruen, Gross, Israel and O'Neal are collectively referred to herein as "Defendants".

## CODE OF BUSINESS CONDUCT AND ETHICS

27.     As members of Platform's Board, Defendants were held to the highest standards of

honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

28.     Further, the conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Platform, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF DEFENDANTS

29.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Platform, Defendants owed Platform and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required Defendants to use their utmost abilities to control and manage Platform in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of Platform and its investors.

30.     Each director of the Company owes to Platform and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

31.     To discharge their duties, the officers and directors of Platform were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Platform were

required to, among other things:

      (a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

      (b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (c)     remain informed as to how Platform conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

      (d)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

      (e)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

32.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Platform Specialty, the absence of good faith on their part, and a reckless disregard for their duties to the

Company and its shareholders that the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

33.     Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, Platform has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

## MATERIALLY FALSE AND MISLEADING STATEMENTS

34.     Platform's business is global in scope and it has a market presence in worldwide.

35.     As an issuer under the U.S. federal securities laws, Platform's business and operations are also subject to the requirements of the FCPA.  The FCPA requires, among other things, covered companies to make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

36.     The FCPA also requires covered companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements, and to maintain accountability for assets.

37.     On February 17, 2015, Defendants caused the Company to issue a press release announcing the completion of its acquisition of Arysta for approximately $3.51 billion (the "Arysta Acquisition").  It was in this press release that the Company stated in relevant part:

> The closing of this acquisition marks Platform's third acquisition
> within the crop protection operating segment after the acquisitions of

Agriphar on October 1, 2014 and Chemtura AgroSolutions ("CAS") on November 3, 2014. Through the Arysta, CAS and Agriphar businesses, Platform has an operating agrochemicals footprint in more than 100 countries and expects to benefit from a global supply chain that should allow operational efficiencies to become realized almost immediately. Platform expects to realize in excess of $65 million in synergies from the combination of these businesses over the next three years. Upon closing of the acquisition, Arysta's President and Chief Executive Officer, Wayne Hewett, became Platform's President, leading the agrochemical businesses and overseeing Platform's ongoing operations.

38.     On this news, the Company's stock price increased $0.75, or 3.3%, to close at $23.43 on February 17, 2015.

39.     On March 18, 2015, Defendants caused the Company to issue a press release announcing Platform's financial and operating results for the quarter and year ended December 31, 2014. For the quarter, Platform reported a net loss of $266.7 million, or $1.59 per diluted share, compared to a net loss of $200.1 million for the same period in the prior year. For 2014, Platform reported a net loss of $262.7 million, or $0.59 per diluted share, compared to a net loss of $203.5 million for 2013.

40.     It was in this March 18, 2015 press release that Leever stated in relevant part:

With the Arysta acquisition — our third and largest AgroSolutions acquisition — completed we have expanded our leadership capabilities and have already accelerated our integration plans. Based on our progress in integration and integration planning in just the past month, we are revising our projected three-year synergy target upwards from $65 million to $80 million.

41.     On March 30, 2015, Defendants caused the Company to issue an annual report on Form 10-K for the year ended December 31, 2014 (the "2014 Form 10-K"). The 2014 Form 10-K reiterated the financial and operating results previously announced in the above-referenced press release.

42.     The 2014 Form 10-K stated in relevant part:

Africa and Middle East represent our most unique region from a sales and marketing perspective due to relatively lower levels of existing distribution infrastructure. In addition, ***growers in these markets may not have access to sufficient amounts of capital and may rely on government programs in order to procure our products.*** In Africa, we have developed an extensive regional distribution network to enable us to deliver our products and products of our distribution partners, including Syngenta and Japanese manufacturers, to the grower. For example, in West Africa, ***we own or operate through partnerships over 90 retail stores. In many cases, growers in this region require additional customer outreach and education as our products and the agronomic techniques to apply them are relatively newer to this market***. Strong grower relationships, deep customer relationships, and a more robust marketing organization are key elements of creating demand and growing sales and profitability in this region.

\*     \*     \*

We are subject to the FCPA, which prohibits companies and their intermediaries from making payments in violation of law to non-U.S. government officials for the purpose of obtaining or retaining business or securing any other improper advantage.

\*     \*     \*

We maintain a Business Conduct and Ethics Policy and a Code of Ethics for Senior Financial Officers which were approved by our Board and cover compliance with the FCPA and similar anti-corruption laws, as well as other legal areas applicable to our operations. We provide compliance training to our employees in an effort to raise awareness, foster compliance and set an expectation of compliance at all levels within the Company. The Business Conduct and Ethics Policy establishes a duty to report non-compliance and provides avenues for making such reports, including a reporting hotline. We also maintain a system for auditing compliance with applicable laws. [Emphasis added].

43.     On May 12, 2015, Defendants caused the Company to issue a press release announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "First Quarter 2015 Report"). For the quarter, the Company reported a net loss of $26.3 million, or $0.14 per diluted share, compared to a net loss of $5.9 million, or $0.07 per diluted share for the

same period in the prior year.

44.     In the First Quarter 2015 Report, Leever stated in relevant part:

> We had a busy yet exciting start to 2015 as we completed the Arysta acquisition and rapidly began integrating our Agricultural Solutions businesses. Our efforts have already resulted in meaningful synergies, and our strategy to focus on specialty crops in niche sectors enabled us to outperform the sector this quarter.

45.     On August 13, 2015, Defendants caused the Company to issue a press release announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Second Quarter 2015 Report"). For the quarter, the Company reported a net loss of $9.1 million, or $0.06 per diluted share, compared to a net loss of $1.5 million, or zero per diluted share for the same period in the prior year.

46.     On August 17, 2015, Platform announced the appointment of Frank J. Monteiro ("Monteiro") as Chief Operating Officer ("COO") of the Company's subsidiary MacDermid, Incorporated and Platform's Performance Applications segment, and the appointment of Sanjiv Khattri ("Khattri") as the Company's Chief Financial Officer ("CFO"), as Monteiro's successor as CFO of Platform, effective September 14, 2015.

47.     On November 10, 2015, Defendants caused the Company to issue a press release announcing the Company's financial and operating results for the quarter ended September 30, 2015 ("Third Quarter 2015 Report"). For the quarter, the Company reported a net loss of $122.3 million, or $0.58 per diluted share, compared to net income of $11.9 million, or $0.08 per diluted share, for the same period in the prior year.

48.     In Third Quarter 2015 Report, the Company's COO Benjamin Gliklich stated, in part:

> **The integration process within Platform's Agricultural Solutions segment continues to be a bright spot for Platform. We are ahead of schedule with approximately $13 million of realized synergies in the third quarter of 2015**, for a total of $26 million since the close of

the Arysta acquisition in first quarter of 2015. Synergies this quarter represent a run-rate of over $50 million. With the financing marketing almost complete, we are now singularly focused on execution and delivering growth and cash flow to our shareholders. [Emphasis added].

49.    On December 16, 2015, the Company announced the retirement of Leever as the Company's CEO, effective immediately, and the appointment of Rakesh Sachdev ("Sachdev") as Leever's successor, effective January 5, 2016.

50.    The statements referenced above were materially false and misleading because (i) Arysta had made improper third-party payments in West Africa; and (ii) that the foregoing payments were unlawful under the FCPA.

## THE TRUTH EMERGES

51.    On March 11, 2016, the Company filed an annual report on Form 10-K with the SEC for the quarter and year ended December 31, 2015 (the "2015 Form 10-K").  For the quarter, Platform reported a net loss of $147.40 million, or $0.68 per diluted share, on revenue of $735.10 million, compared to a net loss of $33.98 million, or $1.61 per diluted share, on revenue of $273.56 million for the same period in the prior year.  For 2015, Platform reported a net loss of $307.60 million, or $1.52 per diluted share, on revenue of $2.54 billion, compared to a net loss of $29.90 million, or $1.94 per diluted share, on revenue of $843.20 million for 2014.

52.    In its 2015 Form 10-K, the Company disclosed that it had "discovered certain payments made to third-party agents in connection with Arysta's government tender business in West Africa which may be illegal or otherwise inappropriate" and had "engaged outside counsel and an outside accounting firm to conduct an internal investigation to review the legality of these and other payments . . . including Arysta's compliance with the FCPA."

53.    As a result of this news, Platform stock fell $0.28 per share, or 3.16%, to close at

$8.57 on March 14, 2016, the following trading day.

54.     On March 14, 2016, shortly before the end of the trading day, the *Wall Street Journal* published a story addressing the disclosures described above, entitled "Chemical Company Notifies U.S. of West Africa FCPA Probe."

55.     On this news, Platform Specialty stock fell $0.62 per share, or 7.23%, to close at $7.95 on March 15, 2016.

## DAMAGE TO PLATFORM

56.     Platform has been, and will continue to be, severely damaged and injured by Defendants' misconduct.  For example, the Company has already incurred costs and expenses in connection with the investigation into its compliance with the FCPA.

57.     Notably, this amount does not include the pecuniary penalty that the Company will likely have to pay to resolve any civil or criminal charges that may arise from its non-compliance with the FCPA.  Nor does this amount reflect the substantial additional costs that could be incurred by Platform in remedying the damage done to the Company by Defendants' failure to establish and maintain internal controls and accounting systems for compliance with the FCPA.

58.     Nevertheless, the Platform Board has taken no action against the person or persons responsible for the damage and injury to the Company, including themselves.  By this action, Plaintiff seeks redress for and vindication of Platform's rights against its wayward fiduciaries.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

59.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

60.     Plaintiff will adequately and fairly represent the interests of the Company and its

shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

61.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

62.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

63.     The Company Board is currently comprised of eight (8) members – Franklin, Leever, Hewett, Ashken, Berggruen, Gross, Israel and O'Neal.  Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, four (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

64.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

65.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

66.     Each of the Defendants approved and/or permitted the wrongs alleged herein to have

occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

67.     Each of the Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

68.     Because of his participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Leever is unable to comply with his fiduciary duties and prosecute this action.  He is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

69.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Demand Defendants Are Not Independent or Disinterested**

**Defendant Leever**

70.     Defendant Leever is not disinterested or independent, and therefore, is incapable of considering demand because Leever (as CEO) is an employee of the Company who derives substantially all of his income from his employment with Platform, making him not independent. As such, Leever cannot independently consider any demand to sue himself for breaching his fiduciary duties to Platform, because that would expose him to liability and threaten his livelihood.

71.     Accordingly, Leever lacks independence from Defendants Berggruen, Israel, and

O'Neal, defendants who are not disinterested and who exert influence over Leever's compensation by virtue of their positions as representing the entire Compensation Committee.  Defendant Leever earned the following in compensation for years 2012-2015:

| Name and Principal Position | Year | Salary ($)(1) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($)(5) | Non-qualified Deferred Compensation Earnings ($)(6) | All Other Compensation ($)(7)(8) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Daniel H. Leever, | 2014 | 850,000 | --- | --- | 1,700,000 | 439,211 | 25,733 | 3,014,944 |
| Chief Executive Officer and | 2013 | 843,750 | 2,500,000(2) | --- | 1,700,000 | 363,590 | 9,233 | 5,416,573 |
| Vice Chairman | 2012 | 818,750 | 43,416(3) | --- | 825,000 | 111,978 | 3,564 | 1,802,708 |

72.     This lack of independence and financial benefits received by Leever renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendant Hewett**

73.     Defendant Hewett is the Company's President, and thus, is a non-independent Director, and therefore, is incapable of considering demand because Hewett (as President) is an employee of the Company who derives substantially all of his income from his employment with Platform, making him not independent.   As such, Hewett cannot independently consider any demand to sue himself for breaching his fiduciary duties to Platform, because that would expose him to liability and threaten his livelihood.

74.     On April 2, 2015, the Company entered into an employment agreement with Hewett. The employment agreement provides Hewett with the following compensation and benefits:

An annual base salary of $900,000.00, paid in monthly installments, subject to periodic review and adjustment by the Compensation Committee;

An annual cash bonus of 100% of Mr. Hewett's base salary if certain "target" goals are met or 200% of Mr. Hewett's base salary if certain "stretch" goals are met, in accordance with our Performance Compensation Plan, subject to periodic review and adjustment by the Compensation Committee;

13,402 RSUs pursuant a separate restricted stock unit agreement dated as of April 2,

2015 (the "RSU Agreement");

A long-term cash bonus award pursuant to a separate long-term cash bonus award agreement, dated as of April 2, 2015 (the "LTCB Agreement"), of $25.0 million (the "LTCB Bonus"); and

Employee benefits consistent with those employee benefit plans provided to other senior executives of Platform.

75.     Pursuant to the LTCB Agreement, Hewett was granted the right to receive upon vesting the LTCB Bonus of $25.0 million.  Subject to Hewett's continuous active employment with Platform through and on March 15, 2020, this grant will vest as follows: (i) 50% on March 15, 2020, if and only if a certain EBITDA target (the "EBITDA Target") is met for any fiscal year of Platform during the period beginning December 31, 2015 and ending December 31, 2019, and (ii) 50% on March 15, 2020, if and only if the Company's common stock meets or exceeds a certain share price target (the "Share Price Target"). The EBITDA Target is subject to appropriate and equitable adjustments by the Compensation Committee to reflect any subsequent acquisition, divestiture or other corporate reorganization of Platform or any of its Related Entities (as defined in the 2013 Plan) in accordance with the terms of the LTCB Agreement. The Share Price Target is also subject to appropriate and equitable adjustments by the Compensation Committee in the event the Company's common stock is no longer publically traded.

76.     In the event Hewett's employment is terminated by the Company or by Hewett on or prior to March 31, 2017, then the Company will pay to Hewett a termination bonus of $5.0 million (less applicable withholdings and employment taxes).  The RSUs granted under the RSU Agreement and the LTCB Bonus shall be forfeited immediately upon such payment.

77.     Accordingly, Hewett lacks independence from Defendants Berggruen, Israel, and O'Neal, defendants who are not disinterested and who exert influence over Hewett's compensation by virtue of their positions as representing the entire Compensation Committee.

78.     This lack of independence and financial benefits received by Hewett renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendant Franklin**

79.     Franklin, Platform's Chairman of the Board, is the managing member of Mariposa. Franklin indirectly beneficially owns 61.32% of Mariposa.

80.     Franklin owns 6.4% of all the outstanding shares of Platform.  Based on a Schedule 13D/A filed by Mariposa on March 20, 2015.  The 12,416,446 shares of Platform owned by Franklin include: (i) 663,349 shares of Common Stock held directly by the Martin E. Franklin Revocable Trust, (ii) 243,110 shares of Common Stock held indirectly by Franklin through RSMA, LLC, (iii) 10,449,987 shares of Common Stock held directly by Mariposa, and (iii) 1,060,000 shares of the Company's Series A Preferred Stock held directly by Mariposa that are convertible at any time at the option of the holder into the same number of shares of Common Stock.  Franklin is the manager of Mariposa and the managing member of RSMA, LLC.  Franklin indirectly beneficially owns 61.32% of Mariposa, representing 6,407,932 shares of Common Stock and 649,992 shares of our Series A Preferred Stock.

81.     In 2014, Franklin also earned $2,000,000 in fees paid to Mariposa Capital, LLC, an affiliate of Martin E. Franklin, pursuant to the Advisory Services Agreement.  Under an Advisory Services Agreement, dated October 31, 2013, with Mariposa Capital, LLC, an affiliate of Martin E. Franklin and Mariposa, Mariposa Capital, LLC provides certain advisory services to Platform and is entitled to receive an annual fee equal to $2.0 million, payable in quarterly installments. This agreement expired on October 31, 2014 and was automatically renewed for one-year. This agreement will be automatically renewed for successive one-year terms unless either party notifies the other party in writing of its intention not to renew this agreement no later than 90 days prior to

the expiration of the term.  This agreement may only be terminated by Platform upon a vote of a majority of its directors. In the event that this agreement is terminated by Platform, the effective date of the termination will be six months following the expiration of the initial term or a renewal term, as the case may be. Platform incurred $2.0 million during the fiscal year 2014 under this agreement.

82.     As of the Company's 2014 Proxy Statement, Franklin beneficially owns approximately 6.4% of the Company's common stock.  In light of these allegations, the futility of seeking a demand from the alleged wrongdoer (who owns 6.4% of all the outstanding shares of Platform) is patent; under such circumstances, efforts to obtain action by Franklin is not necessary, and the allegations of wrongdoing itself adequately establish the reasons for not making the effort to obtain corporate action.

**Defendant Israel**

83.     Israel is currently a partner at Pershing Square Capital Management, L.P. ("Pershing Square"), a research intensive, fundamental value based investment firm based in New York City.

84.     Pershing Square owns 22.2% of all the outstanding shares of Platform.  In light of these allegations, the futility of seeking a demand from the alleged wrongdoer (whose company owns 22.2% of all the outstanding shares of Platform) is patent; under such circumstances, efforts to obtain action by Israel is not necessary, and the allegations of wrongdoing itself adequately establish the reasons for not making the effort to obtain corporate action.

**Defendant Berggruen**

85.     Berggruen has served as the Chairman of Berggruen Holdings Ltd since its inception. Berggruen is a director of the Company.  According to the Company's 2014 Proxy, Berggruen Holdings Ltd. ("BHL"), a British Virgin Islands business company and the Nicolas Berggruen Charitable Trust, a British Virgin Islands trust (the "NB Charitable Trust") may be deemed to

beneficially own and have shared power to vote, or to direct the vote, and shared power to dispose, or to direct the disposition of, an aggregate of 10,871,740 shares of Common Stock.  This amount consists of (i) 9,978,740 shares of Common Stock and (ii) 893,000 shares of our Series A Preferred Stock (the "Series A Preferred Stock") that are convertible at any time at the option of the holder into the same number of shares of Common Stock.

86.     Berggruen Holdings Ltd. owns 5.6% of all the outstanding shares of Platform. In light of these allegations, the futility of seeking a demand from the alleged wrongdoer (whose company owns 5.6% of all the outstanding shares of Platform) is patent; under such circumstances, efforts to obtain action by Israel is not necessary, and the allegations of wrongdoing itself adequately establish the reasons for not making the effort to obtain corporate action.

**Defendant Ashken**

87.     Ashken co-founded Jarden Corporation ("Jarden") and serves as its Vice Chairman and President since June 2014.  Ashken also served as Jarden's Chief Financial Officer until June 2014 and as its Secretary until February 2007.  Ashken was appointed to Jarden's board of directors in June 2001 and became its Vice Chairman, Chief Financial Officer and Secretary effective in September 2001.

88.     Franklin is also the founder and Executive Chairman of Jarden.  Franklin was appointed to Jarden's board of directors in June 2001 and served as Jarden's Chairman and Chief Executive Officer from September 2001 until June 2011, at which time he began service as Executive Chairman at Platform.

89.     Ashken is unwilling or unable to meet his duties as fiduciaries by filing suit himself because he has a professional relationship with Franklin as co-founders of Jarden and has entangling financial alliances, interests and dependencies with Franklin that makes demand futile on Asken.

## FIRST CAUSE OF ACTION

### Against Defendants for Breach of Fiduciary Duties

90.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

91.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

92.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

93.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

94.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

95.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against Defendants for Gross Mismanagement

96.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

97.     By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

98.     As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

99.     Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### Against Defendants for Unjust Enrichment

100.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

101.    By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

102.    Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of the Defendants' bad faith conduct.

103.    Plaintiff, as a shareholder and a representative of the Company, seeks restitution from

Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 15, 2016

                    **SCOTT EGLESTON, P.A.**

                    By: */s/ Scott D. Egleston*
                        Scott D. Egleston
                        152 N.E.167th Street, Suite 300
                        Miami, FL 33162
                        Phone:(305) 892-8088
                        Fax.: (305) 675-3730
                        Email: scott@eglestonlegal.com

Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGESTON**
440 Park Avenue South, 5th Floor
New York, New York 10016
Phone: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-aw.com

*Counsel for Plaintiff*

## VERIFICATION

I, JUSTIN A. TUTTELMAN, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Platform Specialty Products Corporation and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Platform Specialty Products Corporation common stock at all relevant times.

_____
Date

_____
JUSTIN A. TUTTELMAN